IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | CV NO.  04-0229-DAE-RAM |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| SCOLARI WAREHOUSE MARKETS, INCORPORATED, A NEVADA CORPORATION, D/B/A/ SCOLARI'S FOOD AND DRUG; AND DOES 1-10 INCLUSIVE, | ) ) ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

ORDER DENYING SCOLARI'S MOTION FOR SUMMARY JUDGMENT
ON THE PATTERN-OR-PRACTICE CLAIM AND FOR ALL BUT TWO
OF THE CLAIMANTS, NAMELY, MS. FRENCH AND MS. RENFROE;
DENYING SUMMARY JUDGMENT ON SCOLARI'S PUNITIVE
DAMAGES CLAIM; GRANTING SUMMARY JUDGMENT TO DISMISS
MS. FRENCH AND MS. RENFROE; GRANTING THE EEOC'S MOTION
FOR LEAVE TO AMEND COMPLAINT; AND DENYING THE EEOC'S
MOTION TO STRIKE EVIDENCE INSOFAR AS IT PERTAINS TO THE
EVIDENCE IN THIS MOTION

On January 5, 2007, this Court heard Scolari Warehouse Markets,

Inc., a Nevada Corporation and d/b/a Scolari Food & Drug Company's ("Scolari")

Motion for Summary Judgment.  Additionally, this Court heard the Equal

Employment Opportunity Commission's ("EEOC") Objections and Request to

Strike Scolari's Evidence.  Gregory McClinton, Esq., appeared at the hearing on

behalf of Plaintiff; Ray J. Artiano, Esq., appeared at the hearing on behalf of

Scolari.  After reviewing the motions and the supporting and opposing memoranda,

this Court DENIES Scolari's Motion for Summary Judgment For the

Pattern-or-Practice Claim and For All But Two of the Individual Claimants,

Namely, Ms. French and Ms. Renfroe; DENIES Scolari's Motion on the Punitive

Damages Claim; GRANTS Summary Judgment To Dismiss Ms. French and Ms.

Renfroe; GRANTS the EEOC's Motion for Leave to Amend Complaint; and

DENIES Plaintiff's Motion to Strike Evidence Insofar As It Pertains to Evidence

in This Motion.

## BACKGROUND

On May 6, 2004, the EEOC filed a Complaint against Scolari on

behalf of a class of "similarly situated" individuals, employed by Scolari, on the

basis of sexual harassment and retaliation under Title VII of the Civil Rights Act of

1964.  The Complaint was amended on July 1, 2004.  Since on or about January

1999,[1] the Charging Party, Jennifer Gould ("Ms. Gould"), and the other individuals

---

[1] Because this Court is granting the EEOC's Motion for Leave to Amend
Complaint to change the date of the alleged acts from October 2002 to January
1999, this Court will refer to that date in this Order.  See discussion infra Section
C.1.  (The EEOC stated in its interrogatory response No. 91 that it was going to
amend its First Amended Complaint to allege a pattern-or-practice of

claim that they were subjected to a hostile work environment that Scolari's

supervisors perpetuated and to retaliation for complaining of the harassment.[2]

There currently are roughly seventeen (17) named claimants involved in this case,

and an unnamed "class" of similarly situated females for whom the Commission is

seeking relief.[3]

      A.  <u>Scolari's Company Policy Regarding Harassment</u>

      Scolari has an Associates Handbook that states its commitment to

equal opportunity, to equal treatment, and to its policy on sexual harassment.  Each

employee is asked to sign an acknowledgment that they have received after

---

discrimination as early as January 1999.  (<u>Scolari Ex.</u> 7-A.)  To this date, it has not
amended the Complaint, though the EEOC's attorney stated during the hearing that
it still seeks amendment of the Complaint.  For the reasons discussed in Section
C.1, this Court is permitting the amendment.)  Additionally, as noted in Section
C.3 and C.5, the claimants alleging a hostile work environment before October
2002 are Annalisa Schultz, Elaine Cox, Dana Gendreau, Julia Setzer, and Christina
Thomas, and there is sufficient evidence from their deposition testimonies to allow
their cases to go forward.

[2]  Scolari points out that Title VII pattern-or-practice actions are not subject
to class certification requirements under Federal Rules of Civil Procedure ("Rule")
23.  Still, it cited to one case where the court referred to individual claimants as
"class members" for the sake of convenience and for ease of reference.  <u>See</u> <u>EEOC
v.  Foster Wheeler Constructors, Inc.</u>, No.  98 C 1601, 1999 WL 528200, at *1 n.3
(N.D. Ill.  July 13, 1999).  To avoid confusion, this Court will not refer to the
named individuals as "class members," but rather it will refer to them in their
individual capacity or, collectively, as "claimants."

[3]  That number has changed throughout the course of the proceedings,
ranging from twelve (12) to twenty-two (22) members.

reviewing the Handbook.  Scolari also has a company policy prohibiting unlawful discrimination that directs an employee to report acts of discrimination to the employee's supervisor, the Store Manager/Department Manager, Personnel Manager, or to the Human Resources Director.  After which, the policy states that the matter will be investigated promptly and handled appropriately.  Additionally, Scolari provides a training course regarding unlawful discrimination and harassment.

### B.  <u>Charging Party:  Ms. Gould</u>

According to Ms. Gould's deposition testimony, on or around October 5, 2002, Ms. Gould was standing in a circle with three other individuals, Kathy Cain, Lynette Morris, and Head Clerk Mike Lyman.  A then-sixteen year old employee, named Brandi Stockford, allegedly approached the circle and announced that she was not feeling well.  In response, Mr. Lyman allegedly replied, "why don't you suck some cock, you'll feel better," to which Ms. Cain allegedly responded, "I would like to bite one off."[4]  Ms. Gould talked to Ms. Morris that day and told her that she believed that "what Mike had said was bad."  Ms. Gould then wrote down what she heard and who was in the circle, and she gave the note

---

[4] Due to the fact-intensive nature of these motions and the parties numerous citations to and heavy reliance on the explicit language contained in the record, this Court is compelled to recite that language in this Order.

to her Store Director, Larry Smith.[5]  She also expressed her concern with Mr. Lyman's managerial style and reported that she saw Ms. Stockford giving Mr. Lyman a massage a week or so before.

Following those events, Thomas Trebesh, Corporate Director for Scolari, began handling the case.  According to a typewritten letter signed by Ms. Gould, Mr. Trebesh asked her questions and showed her statements from some of the other individuals that were involved in this incident.  Two notable statements were from Ms. Cain and the Store Director, Mr. Smith.  Ms. Cain made a handwritten statement that she had no knowledge of Ms. Stockford being sick, and that she had not heard any conversation between Ms. Stockford and a manager. Mr. Smith also wrote a handwritten statement, denying any inappropriate comments, though he had not been standing in the circle at the time of the alleged harassment. Ms.  Morris, too, subsequently denied hearing any inappropriate remarks, according to an EEOC investigator's questions and handwritten responses.

Based on those statements, Scolari made the decision to suspend Ms. Gould and, then, to terminate her employment.  The termination letter, from Tracy Lerud, Personnel Manager, stated, "Your discharge is a result of your omission of

---

[5] A copy of the handwritten note is attached as Scolari's Exhibit 3-Q.

facts, falsification of personnel or other records, or giving false testimony or witness." (Scolari's Ex. 3-W.)  Mr.  Lyman's employment was not terminated following this incident.[6]  Ms. Gould appealed that decision to a three member panel:  Rod Alec, Donald Crank, and Jim Nelson were the panel members.[7]  The panel unanimously agreed to uphold Ms. Gould's termination.  On October 31, 2002, Ms. Gould filed a Charge of Discrimination with the EEOC.

Subsequently, Ms. Gould wrote a letter to Ms. Morris, dated June 7, 2003, to encourage her to come forward with the truth and to describe the difficulty that she had in obtaining a job following her termination.  Additionally, on January 26, 2006, Mr. Trebesh testified during his deposition that Ms. Cain confessed that she previously had lied about not hearing Mr. Lyman's comment.  During Ms. Cain's deposition, she asserted her Fifth Amendment privilege not to testify.  As for Ms. Stockford, at first she denied that Mr.  Lyman made those comments because, as she claimed during her deposition on May 9, 2005, "she was scared" of

---

[6] He later was terminated on May 26, 2003, following a harassing incident with a checker, during which Mr. Lyman stared at her, and, when asked why he was doing that, he said, "because I can."

[7] The exact positions of those panel members is unclear.  One of them, allegedly, was a representative of Gould's choice and another, allegedly, was an independent human resources consultant.  Donald Crank was a Store Director for Scolari.

getting fired.  During her deposition, however, Ms. Stockford confirmed Ms.

Gould's story and stated that it was wrong that she previously lied.[8]

On August 22, 2003, Mr.  Trebesh wrote a letter to Ms.  Gould,

stating,

> Since our original investigation, we have obtained
> additional information that would lead us to conclude
> that <u>what occurred was actually less than clear</u>.  For this
> reason and <u>in the interest of fairness, we want to give you
> the benefit of the doubt</u>.  We would like to offer you
> reinstatement to your former position as a checker at
> $14.45 per hour.  We would hope that you seriously
> consider this offer.

(<u>Scolari's Ex.</u>  3-LL.)  (Emphasis added.)  Ms. Gould turned down the offer.

### C.  <u>Other Claimants Alleging Harassment</u>

The sixteen (16) other claimants alleging harassment are:  Natasha

McGuire, Melissa Orsle, Jennifer Dicus, Annalisa Schultz, Brandi Stockford,

Rachael Kennedy, Donna Park, Melody Warren (Wagers), Elaine Cox, Dana

Gendreau, Lisa Ricci, Barbara LaForge, Sandra Serrano, Julia Setzer, Katie Jacobs,

and Christina Thomas.[9]  (<u>Scolari's Revised Apx.</u> A.)  Of those claimants, five of

---

[8] Notably, Ms.  Stockford was sixteen-years-old at the time of the incident
and nineteen at the time of the deposition.

[9]  The EEOC claims, over Scolari's objection, that it has received over 500
complaints by women and men attesting to the hostile work environment at Scolari
and to the company's failure to remedy the harassment.  This will be addressed

them ended their employment before October 2002, the date on which the target event occurred that triggered the instant Complaint.[10]

Scolari has numerous stores, each of which is accorded a number, such as Store No. 101, 119, or 127.  The claimants involved in this case worked in various stores.[11]  The most complaints appeared to have occurred in Store No. 119, where Mr. Lyman was employed.

> D. <u>Conciliation</u>

On August 5, 2003, the EEOC sent a Letter of Determination to Scolari regarding Ms. Gould's charge, "invit[ing] the parties to join with it in a collective effort toward a just resolution of this matter."  (<u>Scolari's Ex.</u> 3-PP).  That same day, the EEOC sent Scolari a conciliation letter, summarizing the relief that the Commission sought.  (<u>Scolari's Ex.</u> 3-QQ.)  The letter further stated that, "other reasonable resolution alternatives and offers, besides those listed above, can

---

further in Section B.

[10] Those claimants are:  Annalisa Schultz, Elaine Cox, Dana Gendreau, Julia Setzer, and Christina Thomas.

[11]  One individual worked in Store No. 101; two worked in Store No. 103; four worked in Store No. 126; one worked in Store No. 116; six worked in Store No. 119; one worked in Store No. 111; two worked in Store No. 127; two worked in Store No. 120; one worked in Store No. 123; and one worked in Store No. 124.

be proposed," again inviting Scolari to join in a collective effort toward a just resolution of the matter.  (Id.)

The EEOC sent a third letter on September 30, 2003, notifying Scolari that a previous letter that stated that conciliation had failed was premature. (Scolari's Ex. 3-TT.)  As such, the EEOC provided the parties with another opportunity to resolve the issues in the conciliation process.  That letter further stated, "Ms. Gould was informed that Respondent is offering reinstatement, two months of earnings (less mitigating damages), and three weeks vacation time. During this discussion, Ms. Gould stated Respondent's offer was unacceptable." (Id.)  On September 24, 2003, the EEOC mailed a letter to Scolari's counsel, indicating that efforts to conciliate the charge were unsuccessful.  (Scolari's Ex. 3-UU.)

On May 6, 2004, the EEOC filed the instant Complaint.  Additional facts will be raised as they become relevant.

<u>STANDARD OF REVIEW</u>

Rule 56 requires summary judgment to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c); see also Porter v. California Dept. of Corrections, 419 F.3d 885, 891

(9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

A main purpose of summary judgment is to dispose of factually unsupported

claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  See id. at

323.  A moving party without the ultimate burden of persuasion at trial–usually,

but not always, the defendant–has both the initial burden of production and the

ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire &

Marine Ins. Co., Ltd. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The

burden initially falls upon the moving party to identify for the court those "portions

of the materials on file that it believes demonstrate the absence of any genuine

issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809

F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the

nonmoving party "must set forth specific facts showing that there is a genuine

issue for trial," and the moving party may not rely on the mere allegations in the

pleadings.  Porter, 419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 256 (1986)).  In setting forth "specific facts," the nonmoving party may

not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties.").  "[A]t least some 'significant probative evidence'" must be produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party.  Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage.  Id.  Inferences may be drawn, however, from underlying facts not in dispute, as well as from disputed

facts that the judge is required to resolve in favor of the nonmoving party.  T.W.

Elec. Serv., 809 F.2d at 631.

DISCUSSION

Scolari moves for summary judgment or, in the alternative, partial

summary judgment, on three grounds.  First, it argues that the EEOC did not make

a genuine, good faith effort to resolve this matter informally through conciliation.

Second, it contends that, even when viewing the facts in the light most favorable to

the EEOC, it cannot establish a pattern-or-practice of harassment.  Third, it alleges

that the individual claimant's claims should be dismissed, including Ms. Gould's.

Even if there is merit to the EEOC's claims, which Scolari does not concede,

Scolari also argues that the EEOC cannot obtain punitive damages under the facts

of this case.

Before reaching those arguments, Scolari argues that the EEOC

engaged in misconduct by swearing to false facts related to claimants.  In support,

Scolari picks apart the EEOC's responses to interrogatories, comparing the

responses to some of the claimant's deposition testimony.  This Court sees no merit

to Scolari's argument.  The interrogatories contained some information that might

not have been entirely accurate.  For instance, contrary to what the EEOC noted in

its responses, Ms. Cox stated that Mr. Barnes, her store manager, never made

sexual advances toward her (though she did testify that he showed her nude pictures of himself, which displayed him "standing completely naked with a pair of high heels on and a feather boa") (Cox Depo. at 52); Ms. Park stated that her manager, Mike Hutton, did not say, "I would like to get with you," but rather that he would make comments about her "behind, saying that [she] had a booty like a black girl" (Park at 37), that she was offended by those comments (Park at 37), and that he would make sexually explicit comments about women shoppers (Park at 39, 64); Ms. Gendreau stated that she did not recall whether she mentioned indecent photographs to a co-worker that she saw while developing film, and she did not mention the photographs to her store director (though she did testify that a supervisor showed her nude pictures of him and his girlfriend and made lewd comments) (Gendreau at 47, 57, 72-73, 81, 89-90); and Ms. Ricci did not report complaints about her boss, named "Tom Hunter" (though she did claim that he discussed with her his penis size and his bad sexual relationships, as well as rubbing his penis against her back on multiple occasions and telling distasteful jokes) (Ricci Depo. at 8, 45, 53).  Scolari also criticizes the EEOC for naming as a claimant a person who worked at Scolari for one day.

There is no claim that the EEOC intentionally lied about its responses or that it swore to facts knowing that they were false.  See, cf., Morales v.

<u>Cooperative of Am. Physicians, Inc., Mutual Protection Trust</u>, 180 F.3d 1060, 1063 (9th Cir. 1999) (holding that an interrogatory response in a medical malpractice action that was not entirely accurate did not constitute a statement concealing the existence of an insurance policy to fall under the litigation privilege exception).  The EEOC simply put forth its story, based on information obtained from said claimants before responding to the interrogatories, that, in retrospect, may not have been entirely accurate.[12]  The fact that there may have been some inconsistencies does not indicate that the claimants were lying, as memory fades.  The point is that the EEOC is trying to prove, and as this Order finds that the EEOC has proved, that there are sufficient allegations of sexually harassing conduct, which may or may not have been reported to superiors for a variety of reasons.  Thus, there is no evidence of misconduct, much less intentional misconduct.

---

[12] The EEOC does not respond to this argument, nor does it inform the court about the process that it went through to obtain information from the claimants before responding to the interrogatories.  Still, it is reasonable for this Court to assume, for present purposes, that the EEOC gathered this information through <u>some</u> process, such as interviews or questionnaires, to respond to the interrogatories, seeing as the responses are reasonably detailed and specific to the claimants.

A.  <u>Conciliation</u>

Scolari argues that "the EEOC failed to outline the basis for its cause determination, its theory of recovery, or the calculation of its demand for $790,000.00 or more.  As such, Scolari maintains that "the EEOC engaged in coercion rather than in meaningful conciliation."  (<u>Scolari's Motion</u> at 29.)  The EEOC responds that it engaged in, at least, two formal rounds of conciliation, and, according to the EEOC, an additional pre-lawsuit conference outside of the formal conciliation.  (<u>Opposition</u> at 41.)  First, in its conciliation letter, the EEOC sought $250,000.00 plus lost wages for Ms. Gould and $150,000.00 per claimant (which, at that time, numbered three), plus other non-monetary forms of relief.   The maximum under the law is $300,000.00 in compensatory and punitive damages for each claimant.  <u>See</u> 42 U.S.C. § 1981a(3)(D).  Scolari offered $4,300.00 in backpay for Ms. Gould and nothing for the other claimants, which was unacceptable to Ms. Gould and well under the proposed amount.  Granted, the EEOC, to the best of this Court's knowledge, did not present a full calculation for its demand.  Nonetheless, because that amount was well within the confines of the law, this Court cannot find that the amount that the EEOC proffered was excessive or made in bad faith given the seriousness of the allegations.

The EEOC outlined, as much as necessary, the basis for its cause determination when it specified the charges in its conciliation letter, namely, that it was charging sex-based harassment and retaliation claims.  The fact that it did not outline, in explicit detail, each claim and the theory for each claim at that stage of the proceedings is no reason to find bad faith.  "[D]istrict courts within the Ninth Circuit have adopted the majority approach and have held that the district court should focus on whether the EEOC provided the employer with an opportunity to confront all the issues." EEOC v. Lawry's Restaurant, Inc., No. CV 06-01963DDP, 2006 WL 2085998, at *2 (C.D. Cal. July 17, 2006) (emphasis added).  "This approach comports with the statutory language in Title VII, which gives the EEOC discretion in determining whether a conciliation agreement is acceptable." Id.

The EEOC conducted an Initial Intake Questionnaire for Ms. Gould, further telephonic interviews, and it obtained other written statements from her concerning her charges before filing a Charge of Discrimination on October 31, 2002.  (Scolari's Ex. 3-M, 3-N, 3-Y, 3-Z, 3-AA, 3-BB.)  An EEOC investigator also interviewed Ms. Cain and Ms. Morris, the other two people in the circle with Ms. Gould at the time of the triggering incident, as well as the alleged victim, Ms. Stockford, and one other female employee of Scolari's, Melody Wagers.  (Scolari's

-16-

Ex. 3-II, 3-JJ; EEOC's SOF at 163.)  After  conducting that investigation, the

EEOC contacted Scolari, offering it, at least, two formal rounds of conciliation

and, according to the EEOC, one post-conciliation attempt to settle.

Those actions occurred in 2002.  The Complaint was filed in 2004,

giving the parties adequate time to resolve the issues independent of the Court.

See Lawry's Restaurant, 2006 WL 2085998, at *2.  Furthermore, there was

sufficient information at the employer's disposal to probe and to confront all of the

issues present at that time.[13]  Like the district court found in Lawry's, this Court,

too, finds that "it is unnecessary to stay the proceedings pending further

conciliation efforts because the parties have reached an impasse on a variety of

issues and additional settlement discussions would be futile."  Id.

    B.  Pattern-or-Practice

Under Title VII, the EEOC may bring a pattern-or-practice action on

the basis of sexual harassment.  See EEOC v. Mitsubishi Motor Mfg. of Am., Inc.,

_____

[13] Since then, the EEOC has added claimants to its list of alleged victims of
harassment at Scolari's stores.  Still, the fact that those claimants were not
identified or interviewed at the time of the conciliation does not change the result
of this Court's decision.  Scolari was aware of the alleged harassment against at
least three of its employees and the reasons for that harassment; thus, it was in a
position to confront the EEOC with any concerns that it might have had concerning
alleged harassment occurring in its stores, albeit those concerns would have been
directed toward a narrower group of individuals.

990 F. Supp. 1059, 1071 (C.D. Ill. 1998).  To prove a systemwide,

pattern-or-practice of discrimination, the EEOC must prove, by a preponderance of

evidence, that the sexual harassment was Scolari's "standard operating procedure,"

rather than isolated incidents.  Int'l Brotherhood of Teamsters v. U.S., 431 U.S.

324, 336 (1977); see also Obrey v. Johnson, 400 F.3d 691, 694 (9th Cir. 2005).

"Discriminatory behavior comes in all shapes and sizes, and what might be an

innocuous occurrence in some circumstances may, in the context of a pattern of

discriminatory harassment, take on an altogether different character, causing a

worker to feel demeaned, humiliated, or intimidated on account of her gender."

Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1109 (9th Cir. 1998).  A

pattern-or-practice of harassment ultimately might have a "chilling effect" on the

women in the workforce, causing them to leave out of constructive discharge or

otherwise impairing the working environment.

                In determining whether claims of sexual harassment might amount to

a hostile work environment, a claimant must allege a "pattern of ongoing and

persistent harassment severe enough to alter the conditions of employment."

Burrell v. Star Nursery, Inc., 170 F.3d 951, 954 (9th Cir. 1999) (citation omitted).

"The working environment must 'both subjectively and objectively be perceived as

abusive' because of the sexual harassment." Id. at 954 (citing Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir. 1995)).

"In reviewing the record, the trier of fact must answer two main questions:  (1) was the complainant, 'because of her sex, subjected to such hostile, intimidating, or degrading behavior, verbal or nonverbal, as to affect adversely the conditions under which she worked[,]' and, if so, (2) was 'the defendant's response or lack thereof to its employees' behavior . . . negligent." Mitsubishi, 990 F. Supp. at 1071 (citation omitted).   The first prong requires both an objective and a subjective analysis.  See id.  The second prong requires an inquiry into whether the employer knew or should have known of the harassing behavior, for example, through notice to the employer or through frequent, common and continuous harassing behavior.  See id. at 1071, 1074.   "An employer can be said to be negligent for company-wide sexual harassment when it has a policy or practice of tolerating a work environment that it knows or should have known is permeated with sexual harassment, but does not take steps to address the problem on a company-wide basis."  See id. at 1075.  If there is a company-wide problem, "[s]teps must be taken to determine whether individual incidents, which occur frequently and continuously, are indicative of a larger problem requiring a company wide response."  Id. (citation and internal quotation marks omitted).

Scolari argues that the circumstantial evidence that the EEOC provides and on which it relies does not establish a triable issue of fact to satisfy either prong of the pattern-or-practice analysis.  It focuses on the total number of claimants (17) versus the total number of employees solicited (5,200).  To be sure, statistics are one method by which to prove a pattern-or-practice claim, but they "are not irrefutable."  <u>Teamsters</u>, 431 U.S. at 339-40.  They must be viewed in light of the surrounding circumstances of the case.  <u>See id.</u> at 340.  Even if this Court were to accept Defendant's statistic over the EEOC's objection, the EEOC claims that it has received over 500 complaints by women and men attesting to the hostile work environment at Scolari and to the company's failure to remedy the harassment.  (<u>EEOC Request to Strike</u> at p. 25, fact 62.)  This Court does not make a determination at this stage concerning whether or not that is true, but, in taking the evidence in the light most favorable to the EEOC, it accepts, for now, that there may be more than 17 claims out there.  The fact that the EEOC, at this juncture, may have been able to identify only 17 claimants, out of all possible employees solicited, does not indicate that there is no hostile or harassing work environment, even assuming, for now, that that statistic is true.

There are multiple reasons that people may not step forward, such as out of a fear of losing their job or being singled out for more harassment.  This is

particularly true in cases, such as here, where one employee has stepped forward and has lost her job and others have left, possibly because of coming forward or feeling uncomfortable for being singled out.  This Court finds striking that all but one claimant has left her employment with Scolari.  This Court does not care to speculate about the reasons why other employees have not been willing to sign on to the Complaint; it merely concludes that it does not find the minimal statistical evidence that Scolari provides persuasive because there are numerous other reasons to explain away the comparatively small number of claimants involved in this case.

### 1.  Harassing Behavior

Here, the EEOC has presented numerous instances of undisputed harassing behavior that was directed at the claimants based on their sex.  Some of the comments were so severe that they adversely could have affected working conditions, such as "look at the camel toe on that thing.  I could ride that all day" (Kennedy Depo. at 61-62); "show me your tits" (Warren's Depo. at 55); a comment by Mike Lyman to Ms. Gould about "how well he ate pussy" (Gould Depo. at 31); and displaying pictures of a sexual nature involving nudity. Objectively, a reasonable person could find an environment in which those conditions occurred hostile, and, subjectively, the named claimants could have perceived those conditions as being hostile.  Still, the question remains whether

those acts, legally, rise to the level of a hostile work environment, that is, whether those acts are sufficiently severe or pervasive.

The most frequent acts of sexual harassment appear to have occurred in Store No. 119, mostly by Mike Lyman.  For example, Mr. Lyman allegedly told Ms. Stockford to "suck some cock" when Ms. Stockford told him that she was not feeling well; Mr. Lyman allegedly made unwelcome "vulgar comments" to Ms. Warren, such as "show me your tits" and "I had a dream that you were a "topless dancer" (Warren's Depo. at 55, 60); and Mr. Lyman allegedly told Ms. Gould about "how well he ate pussy."  Another occurrence in Store No. 119 was when Brandon Hood, Ms. Kennedy's Manager, allegedly told her, "look at the camel toe on that thing.  I could ride that all day."

Although the acts occurring in other stores possibly were less frequent, some were quite severe in nature.  For instance, Ms. Ricci's boss, who apparently worked in Store No. 123, discussed his penis size and bad sexual relationships with her and rubbed his penis against her back on multiple occasions; a man named Mr. Barnes showed photographs to Ms. Cox, who worked in Store No. 120, that displayed him "standing completely naked with a pair of high heels on and a feather boa"; and incidents of various sexually harassing behavior occurring at other stores, such as Store 24 and Store 26, to Ms. Jacobs that

involved questions about sexual positions that she had had with boyfriends, rumors being spread about Ms. Jacobs "giving blow jobs in the produce cooler" and "flashing her breasts to the produce guys," and a survey that was conducted in which guys at work voted her "best butt, biggest breasts, and DSL lips, which means dick sucking lips."  (Jacobs' Depo. at 25, 30-31, 86, 90, 102.)  Those acts reasonably could be construed as being more than merely offensive, but as being sufficiently harassing in nature to alter conditions at work negatively.

Some of the harassing behavior, such as supervisors or assistant managers touching or brushing up against some female employees by rubbing hips (namely, Ms. LaForge and Ms. Schultz) (LaForge Depo. at 33; Schultz at 38) or a supervisor showing an employee (namely, Ms. Gendreau) nude pictures of him and his girlfriend and making lewd comments, though inappropriate and both objectively and subjectively offensive, some might suggest may not rise to the level of "severe or pervasive" to form a claim of hostile work environment. Nonetheless, this Court is dealing with a "pattern-or-practice" of harassing behavior that, when the instances of harassment are taken in combination, could rise to the level of a hostile work environment.  The majority of the instances of harassment by employees and/or supervisors or assistant managers that occurred across Scolari's stores within a matter of years (between January 1999 through, to

-23-

the best of this Court's knowledge, sometime in 2003) were sufficiently severe and pervasive, both objectively and subjectively, to rise to the level of a hostile work environment, particularly when viewed in the light most favorable to the EEOC..

Furthermore, these instances are but a handful of examples.  The EEOC maintains, based on Gregory McClinton's Declaration, a lead attorney for the EEOC, that it has received over 500 complaints by women and men attesting to the hostile work environment at Scolari and to the company's failure to remedy the harassment, which could be further established at trial.  This Court is not basing its conclusion that the first prong of the Mitsubishi test has been established on that possibility, as there is sufficient evidence without it to reach this conclusion.  It merely emphasizes that the examples provided may not tell the full story; rather, they comprise but a subset of what may be to come.  Though, even without more, there is enough here to satisfy the first prong.

### 2. Scolari's Response to Behavior

This Court now turns to the second prong, i.e., Scolari's response or lack thereof to the harassing behavior.  First, this Court notes that, although Scolari relies on its company policy for safety, where a tangible employment action has occurred, such as termination, the employer is strictly liable.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  Thus, in the case of Ms. Gould,

and possibly other claimants, Scolari's policy will not save it, if her termination, in fact, was based on her act of informing management of the situation with Ms. Stockford.

Second, when no tangible employment action is taken, company policies prohibiting harassment and providing steps to take to eradicate that harassment may be used as an affirmative defense to a claim of hostile work environment.[14]  See id. at 765.  "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and [to] correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably

_____

[14] For claims of constructive discharge, "[a] plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."  Suders, 542 U.S. at 147 (2004). Circuits are split on whether a constructive discharge constitutes a tangible employment action.  This issue is an open question in the Ninth Circuit.  See, e.g., Hardage v. CBS Broadcasting, Inc., 427 F.3d 1177, 1185 (9th Cir. 2005) (finding no constructive discharge, without answering whether a constructive discharge may constitute a tangible employment action); Montero v AGCO Corp., 192 F.3d 856, 861 (9th Cir. 1999) (deciding not to make this determination because Plaintiff was not constructively discharged).  This Court is unclear as to whether the EEOC is arguing that "constructive discharge" is a tangible employment action.  Its brief, from what this Court has seen, does not clarify its position on that, though it appears to argue in its Statement of Material Facts, in numerous instances, that Scolari is strictly liable, under Burlington Indus., 524 U.S. at 765, for actions against some claimants.  Because it is unclear whether the EEOC is arguing that all claimants have suffered tangible employment actions at the hands of Scolari, as currently defined in case law, or whether some claimants left due to constructive discharge and whether that discharge rises to the level of a tangible employment action, this Court shall not make any rulings of law on that issue at this time.

failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Id.

Here, there are genuine issues of material fact concerning whether all or some of the employees took advantage of any preventative or corrective opportunities and whether Scolari exercised reasonable care to prevent and to correct promptly any sexually harassing behavior.  First, this Court notes that almost all of the allegations of sexual harassment involved managers, including Corporate Director, Tom Trebesh, Store Directors Donald Crank and Greg Herring, Managers Dean Osborne, Brandon Hood, Sean Flaherty, Tom Barnes and Martin Hager, and Head Clerk Mike Lyman.  There is a dispute, however, as to whether certain employees brought their complaints to the attention of their managers and the effects of those complaints.  For instance, although difficult to discern from the deposition testimony provided, the EEOC argues that Ms. Ricci sent a letter to Scolari's owners complaining about harassing behavior and whether she spoke to Tracy Lerud at human resources.  (Disputed Facts at 25; Ricci Depo. at 103-04.)  Scolari points out that Ms. Ricci, at another point in her deposition, testified that she did not report her manager's harassing conduct to the human resources department.  The EEOC argues that that point is "undisputed and irrelevant," as it does in some other instances, stating that Scolari is strictly liable

under Burlington Indus., 524 U.S. at 765. (EEOC SOF at fact 298.)  This Court

comments, however, that Scolari may be strictly liable only if a constructive

discharge constitutes a tangible employment action, unless the EEOC has enough

evidence to prove that Ms. Ricci was fired for informing her managers of the

harassing conduct, if she indeed did that.  In any case, genuine issues of material

fact have been created, that is, did Ms. Ricci, in fact, report the harassing conduct

to her managers; if so, to whom; and if so, was she terminated because of that

action?

Another example is when Ms. Jacobs testified that the store owners,

Joey and Jerry Scolari, "stare[d] at [her] ass" and "looked at [her] breasts all the

time." (Jacobs Depo. at 90-91.)  She stated that she felt that if she complained, she

would have been fired.  (Jacobs Depo. at 92.)  She subsequently left her

employment in March 2004.  Defendants point out that the only way that she could

recall this harassment was after she looked at the EEOC attorney's notes, which the

EEOC represented as Jacobs' notes.  (Scolari's Motion at 60.)  This creates a

genuine issue of material fact about why Ms. Jacobs left her employment and what

actually occurred during her employment.  Although the EEOC did not argue this,

or, if it did, it was not obvious from its brief, these facts could amount to a

constructive discharge.

Yet another example is when Ms. Gould complained about the situation with Ms. Stockford and Mr. Lyman, and, subsequently, was terminated as "a result of [her] omission of facts, falsification of personnel or other records, or giving false testimony or witness." She appealed, and her termination was upheld. Only afterwards did Scolari admit that "what occurred was actually less than clear," offering Ms. Gould reinstatement, which she turned down.

Finally, though only moderately helpful without reasons for leaving, all but one of the female claimants has left employment with Scolari. The parties do not lay out, individually, why each employee left, and it is not this Court's responsibility to dig through the record (or through the voluminous briefs for that matter) for such information, but, on its face, that fact does not bode well for Scolari.

Furthermore, this Court finds particularly instructive the expert, Michael Robbins' report. (EEOC Ex. at 39.) Notably, Mr. Robbins "has worked as an expert witness on more than 250 occasions," and he "has extensive experience conducting harassment, discrimination and employee misconduct investigations– having conducted over 200 workplace investigations." (Id. at Ex. A.) Many of his other accomplishments, such as his background in employment law, his publications in employment law journals and reports, his teaching and

lecturing experience at various employment law centers and law schools, and his

membership on the Executive Board of the Los Angeles County Bar Association's

Labor & Employment Law Section, as well as others, leads this Court to view Mr.

Robbins as a reputable source of expert testimony.

   Mr. Robbins' report is based on the testimony of Company witnesses,

and it is rife with instances indicating a failure to exercise reasonable care in

dealing with the instances of harassment.  For example, Ms. McGuire (a cashier) in

a 2003 letter to the Company's CEO and to the COO accused a number of people

of harassment, including Paul McEwen (Store Director) and Shawn Flaharty (Head

Clerk).  Still, no one spoke to Mr. McEwen about this or to Mr. Flaharty until

2005.  (Report at 3.)  Additionally, although not all allegations were reported to

human resources (for a variety of reasons), even when such allegations were

reported to human resources, they were not investigated fully.  The best example

would be Ms. Gould.  Following the investigation, Scolari even admitted that it

acted too soon.  (Report at 4.)  Additionally, rather than an investigation into Ms.

Wagers' complaint, Mr. Smith "simply talked to Wagers.  And, nothing more was

done."  (Report at 10.)  Moreover, after Ms. Kennedy's "camel toe" incident,

allegations arose two years later against Mr. Hood, the supervisor who said it, for

making the same comment.  Only then did Mr. Hood admit to making it, and he was "disciplined" for it.  (Report at 14.)

Still, this Court notes Scolari's argument that "none of the eligible class members claim that she made a complaint to Human Resources regarding conduct perceived as sexual harassment" and that "most of the class never reported any inappropriate behavior to Human Resources or to the store director," pointing to 13 class members.  (Scolari Motion at 21.)  Scolari also takes issue with the reasons why some of the employees left; for instance, it states that Ms. McGuire resigned on October 27, 2003 because she had a poor attendance policy.  Notwithstanding, this Court takes heed of Ms. McGuire's letter, written on June 18, 2003, expressing her concern over retaliation and over the "hostile work environment" that was "threat[ening]" her.  (EEOC Ex. 47.)

Ms. McGuire also testified during her deposition that she was suspended, but that that suspension was revoked because she had a doctor's note for being sick.  (McGuire Depo. at 63, pp. 36-38.)  Tracey Lerud somehow was involved in that matter, and she may or may not have treated Ms. McGuire fairly.  (Id. at 39.)  Additionally, from what this Court gathers from the record, Ms. McGuire reported sexually harassing conduct to her managers, even though she stated on at least a couple of occasions that she was in fear of losing her job for

reporting such conduct.  (McGuire Depo. at 97, 110, 123.)  When she was given an option to transfer to another store, she declined it because she did not feel that she was doing anything wrong.  (Id. at 113.)  She further stated, "I felt that if I went to another store if they didn't protect me at my store why were they going to protect me at another store."  (Id. at 113.)  With this, and without knowing the full story about why Ms. McGuire (and others) were terminated, this Court cannot dismiss this case (or Ms. McGuire's and others' individual claims, as will be discussed) at this stage when there are genuine issues of material facts in dispute.  As the EEOC points out, Scolari's reasons could be pretextual, but, right now, that answer is unclear.  See, e.g., Dominguez-Curry, 424 F.3d at 1037.

This Court finds particularly disturbing the number of instances of harassing conduct, the nature of the conduct, and the testimonials of fear of consequences that, when viewed in the light most favorable to the EEOC, could prove a pattern-or-practice of discrimination.  That said, it is too early for that to be determined because there are a number of material facts in dispute.  It could be that, rather than a pattern-or-practice or hostile work environment, there truly was only one or a handful of parties at fault, namely, Mr. Lyman, and some other managers/store directors.  At this point, this Court cannot determine whether the acts noted above, and others that the EEOC believes might come forward

throughout the course of this litigation, rise to the level of a pattern-or-practice claim, nor is it asked to at this stage as the EEOC did not file a summary judgment motion.   It merely finds that Scolari has failed in its burden to prove that there are no genuine issues of material fact in dispute; thus, its motion for summary judgment concerning the pattern-or-practice claim is DENIED.

### C.  Individual Claimants

Scolari next moves for summary judgment on the individual claimants, arguing that Ms. Gould's claim fails as a matter of law and addressing the other individual claimants' claims in regard to the strength of each as a composition of the group of claimants contributing to the pattern-or-practice claim.

### 1. Motion for Leave to Amend Complaint

Scolari argues that seven of the twenty (20) claimants were not employed at Scolari at any time "since on or about October 2002"; thus, they are not eligible "class members."[15]   (Scolari's Motion at 20.)  The EEOC responded in its Opposition, arguing that they are eligible.  As for the seven members, Ms. Setzer, Ms. French, Ms. Cox, Ms. Thomas, Ms. Schultz, and Ms. Gendreau, that

---

[15]  Confusingly, Scolari included only seventeen (17) class members on its Revised Appendix A, and, minus the two claimants that this court dismisses, this Court counts only seventeen (17) class members.  The Appendix was filed after Scolari filed its Motion.  Scolari may have winnowed down the list after receiving the EEOC's Amended Opposition, filed on November 21, 2006.

were not employed in 2002, this Court sees no reason to dismiss their claims based on that fact alone.

The EEOC stated in interrogatory response No. 91 that it was going to amend its Complaint, changing the time period from when the harassing conduct began to occur from October 2002 to January 1999.  The reasoning provided was that, on July 6, 2006, the EEOC informed Scolari in writing that, after conducting discovery, it identified a broader group of individual claimants.   (Scolari Ex. 40.)  In that letter, the EEOC sought a stipulation to amend the Complaint to make the relevant time period starting in January 1999.  (Id.)  A party may amend a pleading with leave of the court "upon motion of any party at any time, even after judgment." Fed.R.Civ.P. 15(b).  Although it is not entirely clear whether the EEOC is requesting this of the Court; this Court will take the opportunity to allow the EEOC to amend its Complaint, in the interest of justice.  To the best of this Court's knowledge, Scolari has not objected to that amendment, under Rule 15(b), arguing prejudice.  Even if it had, however, this Court still would allow the amendment, in the interest of justice, because the EEOC has provided adequate reasoning to enlarge the group of claimants, without presenting any new prejudice to Scolari.

2.  Statute of Limitations

This Court now turns to the potential statute of limitations problems. The EEOC is the only federal law enforcement agency that may pursue pattern-or-practice claims against private entities.  See 42 U.S.C. § 2000e-6 (pattern-or-practice claims commonly are referred to as "707 cases" because authority is derived from § 707 of Title VII).  Unlike private litigants, a statute of limitations does not apply when the EEOC brings a pattern-or-practice suit.[16]  See 42 U.S.C. § 2000e-6; see also Mitsubishi, 990 F. Supp. at 1083-84 (commenting that 707 claims do not contain a statute of limitations for pattern-or-practice cases initiated by a Commissioner's charge); U.S. v. Fresno Unified School Dist., 592 F.2d 1088, 1096 n.5 (9th Cir. 1979) (noting, indirectly, that statute of limitations for 707 claims may be illogical because there is no certain date from which the limitations period could run).  See generally Federal Procedure, Lawyer's Edition § 50-633 (1997) ("There is [] no statute of limitations under Title VII for pattern-or-practice suits brought by the EEOC.")

---

[16] For private suits, "a litigant has up to 180 or 300 days after the unlawful practice happened to file a charge with the EEOC"; the time-frame during which to file depends on whether the state at issue has its own entity, such as an employment agency, with the authority to grant or to seek relief.  See Morgan, 536 U.S. at 109-10.  The Morgan court directly left open timely filing questions regarding "'pattern-or-practice' claims brought by private litigants," but that is not what this Court is dealing with here. Id. at 115 n.9.

Notwithstanding, Scolari does not appear to argue that the EEOC's pattern-or-practice claim is susceptible to a statute of limitations problem, but rather it argues that individuals not employed with Scolari during the 180/300-day period or during the alleged pattern-or-practice, beginning on or about October 2002, are not covered.  As addressed above, this Court is permitting the Motion for Leave to Amend Complaint to allow the allegations to date back to January 1999. Thus, the individuals with allegations dating back to that date are not dismissed as being outside of the statute of limitations period because they are rightful members of the pattern-or-practice claim brought by the EEOC.   Additionally, Scolari argues that individuals not employed with it during the 180/300-day period of limitations cannot recover.  The EEOC notes, in footnote 8, that "[a]lthough no administrative time-limit applies to either of the EEOC's claims, the Supreme Court has held that the 300-day limitation (rather than the 180-day limitation) applies in Nevada for individual administrative charges."  (Emphasis added.) Because there are no individual charges in this case, outside of Ms. Gould's triggering charge, this Court need not concern itself with potential timeliness problems that Scolari raises for individual claimants.

### 3. Ms. Gould, Ms. Stockford, Ms. Jacobs, Ms. McGuire, Ms. Wagers, Ms. Cox, Ms. Kennedy, Ms. Ricci, and Ms. Gendreau

This Court disagrees that Ms. Gould's individual claim of sexual harassment and retaliation fail as a matter of law, for all of the factual disputes listed above. It sees no reason to reiterate the facts and the arguments again. As for Ms. Stockford, Ms. McGuire, Ms. Jacobs, Ms. Cox, Ms. Wagers, Ms. Ricci, Ms. Kennedy, and Ms. Gendreau, for the same reason, this Court disagrees that their claims fail as a matter of law. There are facts in dispute concerning whether some of the claimants reported sexually harassing conduct and, if not, why they failed to report it, and, finally, why they left their employment with Scolari.

### 4. Ms. Orsie

Scolari faults Ms. Orsie for signing the Associate Handbook, going through the training course, not making complaints about sexual harassment, namely, that Mr. Crank, her manager, stared at her chest and touched her shoulder "a lot," and then abandoning her job without notice. (Orsie Depo. at 37-38.) The EEOC objects, arguing that Ms. Orsie "felt extremely uncomfortable" working at Scolari, which is why she quit, though she did not mention this to anyone. (Orsie Depo. at 36.) The EEOC, moreover, makes the point that Mr. Crank's activities made her "feel really uncomfortable." (Orsie at 40.) Alone those acts do not rise

to the level of "severe or pervasive conduct"; thus, as a matter of law, Ms. Orsie

would not be able to maintain an individual sexual harassment complaint.  That is

not, however, what this Court is dealing with here.  Rather, this case involves a

pattern-or-practice of harassment that rises to the level of a hostile work

environment claim, which claims are "comprised of a series of separate acts that

collectively constitute 'one unlawful employment practice.'"  Morgan, 536 U.S. at

117.  Thus, Ms. Orsie's complained-of acts, when combined with all of the other

claims of harassing behavior and when viewed in total with the other claims, may

be used to support the EEOC's hostile work environment claim.

> 5.   Remaining claimants:  Kathleen French, GeGe Renfroe, Julia
> Setzer, Jennifer Dicus, Barbara LaForge, Donna Park, Sandra Serrano,
> Annalisa Schultz, and Christina Thomas

First, the EEOC is not seeking relief on behalf of Ms. French or Ms.

Renfroe.  (EEOC SOF at 255-56.)  Thus, they are dismissed.

Second, Scolari combats the EEOC's inclusion of Ms. Setzer by

arguing that she was terminated or that she left her employment, due to "issues

with co-employees" and for taking time off of work for a non-work related foot

injury during the last two months of her employment, rather than for the sexually

harassing behavior of which she complains.  Ms. Setzer testified during her

deposition that coworkers would come by her work station and stare at her breasts;

when she complained to her female manager, she was told that "you have big breasts, and that's what they're [i.e., the coworkers] are here for."  (Setzer's Depo. at 15.)  She further testified that there used to be Maxim magazines with half dressed women spread all over the tables in the store break room, which made her feel uncomfortable.  (Id. at 16.)  Notably, Ms. Setzer is a licensed ordained minister.  (Id. at 6.)  Based on those facts, there is a genuine dispute about whether Ms. Setzer was terminated due to legitimate employment reasons, whether she left out of constructive discharge, or whether those employment concerns are mere pretext for unlawful employment practices.

Third, Scolari wants to dismiss Ms. Dicus, arguing that her only claims are that her manager was very controlling and hard to work with, which would not contribute to a claim of hostile work environment.   The EEOC responds that Ms. Dicus's supervisors, Mr. Hagar and Tom Burrows, would look at pictures of hookers from Thailand on the work computer and discuss them (Dicus Depo. at 49); that Mr. Burrows would make comments about Ms. Dicus's body (Dicus at 57); and that Hagar would call a woman named "Bonny" a "big pussy," i.e., that she either was one or that she had one (Dicus at 89-90.)  Those disagreements create genuine issues of material fact concerning the acts that occurred and whether

those acts, depending on what they actually are, rise to the level of severe or pervasive conduct (or add to that conduct) to create a hostile work environment.

Fourth, Scolari claims that Ms. LaForge complained of problems concerning employee gossip, rules broken, insubordinate behavior and other such behavior that is <u>not</u> based on sex.  The EEOC points to evidence in Ms. LaForge's deposition that a coworker named "Jerry" sexually harassed her; that he placed his hip next to hers; and that she complained to her store manager about a "pushing incident" that was sexual in nature.  (<u>LaForge Depo.</u> Ex. 60, 32, 38, 39.)  A genuine issue of material fact is created as to whether or not the harassing behavior was, in fact, based on sex.

Fifth, Scolari contends that Ms. Park was terminated for falsifying her employment by omitting her previous employment with Scolari.  The EEOC argues that Park claimed that her manager, Mike Hutton, would make comments about her "behind, saying that [she] had a booty like a black girl" (<u>Park Depo.</u> at 37), that she was offended by those comments (<u>Id.</u>), and that he would make sexually explicit comments about women shoppers (<u>Id.</u> at 39, 64).  Those comments made her "feel bad" and "sad."  (<u>Id.</u> at 64.)  A genuine issue of material fact is created as to whether Ms. Park was terminated for legitimate reasons or whether those reasons were pretextual.

Sixth, Scolari contends that Ms. Serrano was terminated for cashing personal checks.  The Appeal Board unanimously upheld this.  The EEOC claims that Ms. Serrano alleges that male employees in the produce department asked her "what type of underwear are you wearing" and "how far would you go on the first date, what is your cup size," and other similar remarks, and that she complained to her manager, "Mark."  (Serrano Depo. at 30-32.)  She also alleges that "Mark" made offensive jokes to her, though her recollection of those jokes was not great.  (Id. at 39.)  This creates a genuine issue of material fact concerning whether Ms. Serrano was terminated for pretextual reasons.

Seventh, Scolari seeks to dismiss Ms. Schultz, arguing that she was dismissed for "excessive tardiness."  Schultz testified during her deposition, however, that some employees, including managers "Rich" and "Gordy," told "off-color jokes" that "were mostly sexual in nature."  (Schultz Depo. at 21-22.)  She also recalled a comment about a customer looking like a "whore," though she did not recall who said that.  (Id. at 26.)   She did state, however, that she did not complain about it because "it was managers that were doing it."  (Id. at 29.)  There are other allegations, but these alone raise a genuine issue of material fact concerning whether Ms. Schultz was dismissed for "excessive tardiness" or for other pretextual reasons, such as being a trouble-maker or something akin.

Eighth, Scolari argues that Ms. Thomas voluntarily resigned to go back to school.  Scolari makes an issue out of the fact that her co-worker, Sal Scavo, and a manager, Dean Osborne, sexually harassed her, but yet Ms. Thomas did not complain about this to management.  (Thomas Depo. at 36.) The EEOC objects to Ms. Thomas's reasons for leaving as irrelevant.  This Court finds Ms. Thomas's reasons for leaving employment relevant, but, it does not, at this point, draw any conclusions from those reasons.  Additionally, this Court finds Ms. Thomas's reasons for not reporting the conduct to management highly relevant. Ms. Thomas stated, "[i]t was kind of a well-known fact at the store that that kind of stuff was going on with Dean to other female employees, and they had supposedly complained and nothing was done about it.  That's why everybody would just try to avoid him." (Thomas Depo. at 36.)  That creates a genuine issue of material fact about whether harassment existed, about the reasons why Ms. Thomas failed to report that behavior to management, i.e., for fear of consequences, and whether that harassment, if it in fact is true, constituted a constructive discharge, thus prompting Ms. Thomas to go back to school as a safeguard from the company.

D.  Punitive Damages

Punitive damages may be awarded if the EEOC can demonstrate that Defendant engaged in a discriminatory practice with malice or reckless

indifference to its employees' rights.  <u>See</u> 42 U.S.C. § 1981a(b)(1); <u>see also</u>

<u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 535-36 (1999).  Those terms

"ultimately focus on the actor's state of mind."  <u>Kolstad</u>, 527 U.S. at 526.  There is

a "good faith" exception where an employer may avoid vicarious liability for

discriminatory employment decisions of its agents, *i.e.*, its managers, if those

decisions are contrary to the employer's "good faith efforts to comply with Title

VII."  <u>Kolstad</u>, 527 U.S. at 545.

       To start, the employer, Scolari, put anti-harassment policies in place to

combat discriminatory policies.  The fact that there were policies in place,

however, does not automatically lead to the conclusion that Scolari made

"good-faith efforts to comply with Title VII."  One can have good faith efforts to

start, but then fall short in practice.

       Besides all of the allegations of harassment against the  managers,

Scolari's <u>owners</u> are accused of harassment, possibly imputing their conduct to

Scolari, the entity.  The owners' clear disregard for the policies that they put in

place is, if proven, remarkable.  But, remarkable does not necessarily equate to

malicious or reckless indifference, which requires "an additional [higher]

demonstration" that may be reviewed only by looking to the owners' subjective

intent.  <u>Kolstad</u>, 527 U.S. at 526, 534.  "The terms 'malice' or 'reckless

indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Id. at 535. A showing of "egregiousness" is not required to demonstrate malice or reckless indifference, "although evidence of egregious misconduct may be used to meet the plaintiff's burden of proof." Id. at 546. A mere "disregard," without a showing of intent, would not prove a knowing violation of federal law to rise to the level of malice or reckless indifference. Thus, the question becomes, is there enough evidence for a jury reasonably to find intent on the part of Scolari's owners and managers to discriminate, namely, to harass the claimants sexually with knowledge that they may have been acting in violation of federal law?

In the Memorandum on "Company Policy - Unlawful Discrimination," it states that "Congress has also made such practices [of discrimination] illegal by virtue of Title VII of the Civil Rights Act of 1964, the age discrimination in Employment Act Section 504 of the Rehabilitation Act of 1973, and other applicable legislation." The Memorandum goes on to describe its policy prohibiting sexual harassment. At the bottom of that memorandum is a note, "Please Post Permanently," indicating that that memorandum was posted permanently in Scolari's stores. (Scolari's Ex. at 1-B.) The Associates Handbook does not appear to state the actual federal law at issue, though it does state its

-43-

commitment to preventing "illegal harassment" and discrimination.  (Scolari's Ex. at 1-A, at p. 10.)  The written material used in Scolari's training seminar similarly indicates the company's intention not to permit harassing behavior, without specifically noting the federal law at issue.  (Scolari's Ex. at 1-C.)

This Court acknowledges that "[t]he very structure of § 1981a suggests a congressional intent to authorize punitive awards in only a subset of cases involving intentional discrimination."  Kolstad, 527 U.S. at 534-35.  It, furthermore, takes heed of the circumstances under which claims of intentional discrimination will not give rise to punitive damages, such as where the employer is "unaware of the relevant federal prohibition" and where an "employer discriminates with the distinct belief that its discrimination is lawful."  Id. at 537; see also id. at 551 (Stevens, J., with whom Souter, J., Ginsburg, J., and Breyer, J. join) (indicating, in passing, ways for an employer to prove willful violation of the law, such as through hostility toward employment discrimination laws).  In the instant case, Scolari's owners, as well as the managers, are being accused of harassing behavior in violation of their own policies, one of which explicitly states that discriminatory behavior constitutes a violation of Title VII.  Those facts, if proven, could indicate an awareness of (and possibly a hostility toward) the

relevant federal prohibition against sexual harassment and discriminatory conduct and a reckless indifference toward it.

The inquiry does not end there, however. The EEOC still must impute liability of the owners and the managers to Scolari, the entity. See 527 U.S. at 539. As mentioned, where good faith efforts to comply with Title VII are made, punitive damages may be avoided. See id. at 545. From what is before this Court, particularly the instances of alleged harassment by the owners, there is enough evidence that, if true, could support an inference that the requisite mental state of Scolari's owners and managers may be imputed to Scolari, the entity. See id. at 546. The fact that policies are in existence, without implementation or enforcement of the policies, means nothing.

Accordingly, based on the facts of this case, a genuine issue of material fact has been established concerning whether Scolari's owners and managers acted with the requisite mental state, i.e., malice or reckless indifference, to classify as one of those "subsets" of intentional discrimination cases that would permit an award of punitive damages. If at a later stage of these proceedings it appears that the record does not suggest going forward with a punitive damages claim, then the claim can be dismissed at that time.

<u>CONCLUSION</u>

For the reasons stated above, this Court DENIES Scolari's Motion for Summary Judgment For the Pattern-or-Practice Claim and For All But Two of the Individual Claimants, Namely, Ms. French and Ms. Renfroe; DENIES Scolari's Motion on the Punitive Damages Claim; GRANTS Summary Judgment To Dismiss Ms. French and Ms. Renfroe; GRANTS the EEOC's Motion for Leave to Amend Complaint; and DENIES Plaintiff's Motion to Strike Evidence Insofar As It Pertains to Evidence in This Motion.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, January 29, 2007.

_____
DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE

<u>U.S. Equal Employment Opportunity Commission vs. Scolari Warehouse Markets, Incorporated, et al.</u>, CV. NO. 04-0229-DAE-RAM; ORDER DENYING SCOLARI'S MOTION FOR SUMMARY JUDGMENT ON THE PATTERN-OR-PRACTICE CLAIM AND FOR ALL BUT TWO OF THE CLAIMANTS, NAMELY, MS. FRENCH AND MS. RENFROE; DENYING SUMMARY JUDGMENT ON SCOLARI'S PUNITIVE DAMAGES CLAIM; GRANTING SUMMARY JUDGMENT TO DISMISS MS. FRENCH AND MS. RENFROE; GRANTING THE EEOC'S MOTION FOR LEAVE TO AMEND COMPLAINT; AND DENYING THE EEOC'S MOTION TO STRIKE EVIDENCE INSOFAR AS IT PERTAINS TO THE EVIDENCE IN THIS MOTION